# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ROBERT WILLIAMS, *et al.*,

      Plaintiffs,

      v.

TOM VILSACK, Secretary of the United
States Department of Agriculture, *et al.*,

      Defendants.

Civil Action No. 03-2245 (CKK)

## MEMORANDUM OPINION
(June 1, 2009)

Plaintiffs Robert and LaVerne Williams allege that they were discriminated against on the basis of race by the United States Department of Agriculture ("USDA") when their application for a farm loan was denied in 2003. Defendant Ed Schafer, Secretary of the United States Department of Agriculture (together with the United States and other government officials sued in their official capacities, "Defendants"), deny Plaintiffs' allegations and have filed the pending [223] Motion for Summary Judgment.[1] After a searching review of the parties' submissions, relevant case law, statutory authority, and the entire record of the case as a whole, the Court finds that there is no evidence in the record from which to find that Plaintiffs were subject to discrimination based on their race. Accordingly, the Court shall GRANT Defendants' [223] Motion for Summary Judgment, for the reasons that follow.

---

[1] The Court has substituted Secretary Vilsack for the name of his originally-named predecessor, Secretary Ann Veneman, pursuant to Federal Rule of Civil Procedure 25(d) ("[a]n action does not abate when a public officer who is a party in an official capacity . . . ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party").

# I. BACKGROUND

*A.        Statutory and Regulatory Background*

This case involves the Consolidated Farm and Rural Development Act, 7 U.S.C. § 1921

*et seq.*, pursuant to which the Farm Service Agency ("FSA") is authorized to make loans to (1)

eligible farmers who (2) propose plans of operation that are feasible. *See* 7 C.F.R. §§ 1910.5,

1941.12, 1941.33.  With respect to this first requirement (eligibility), the FSA considers various

enumerated criteria, including an inquiry into an applicant's credit history.  7 C.F.R. § 1910.5(b),

(c).  Pursuant to an instruction issued by the USDA, this inquiry includes an assessment of

whether the applicant is "creditworthy" in the sense that he or she must not have provided false

information in connection with the loan application:

> Applicants . . .  will be determined not creditworthy if they have ever deliberately
> provided false information, intentionally omitted information relative to the loan
> decision, or have not made every reasonable effort to meet the terms and
> conditions of any previous loan.

Defs.' Reply, Ex. A at 2 (Instruction 1910-A(c)).  With respect to the second requirement (a

feasible plan), the FSA reviews the applicant's plan to assess whether the applicant will be able

to:

> (1) Pay all operating expenses and all taxes which are due during the projected
>     farm budget period;
> (2) Meet necessary payments on all debts; and
> (3) Provide living expenses for the [applicant's] family members

7 C.F.R. § 1931.33(b), 1941.4.  Only loans that comply with all established policies and

regulations, including the requirement that "[t]he proposed loan is based on a feasible plan," are

subject to approval.  *Id.* § 1931.33(b).

B.      Factual Background

The following material facts are based on undisputed evidence in the record.[2]  Plaintiffs

own a small cotton farm in Roscoe, Texas.  Defs.' Stmt. ¶ 1.  In early 2003, Plaintiffs applied for

a farm loan from the FSA.  Id. ¶ 4.  In connection with their loan application, Plaintiffs met with

Robert Kalina, a Farm Loan Manager.  Id. ¶¶ 4, 5.  With Mr. Kalina's assistance, Plaintiffs

submitted a complete loan application in March 2003.  Id. ¶¶ 8, 12.

On April 4, 2003, Mr. Kalina and Plaintiffs developed a Farm and Home Plan (the

"Plan") that would "cash flow," a term of art used to describe a feasible plan whereby an

applicant is able to (1) pay all of his or her farm operating expenses and taxes, (2) meet necessary

payments on debts, and (3) provide living expenses for family members.  Id. ¶ 13.  The Plan met

these requirements by $152.  Id.

As part of the loan application process, Mr. Kalina conducted an equipment inspection

---

[2] The Court notes that it strictly adheres to the text of Local Civil Rule 7(h)(1) (formerly 56.1) when resolving motions for summary judgment.  The Court instructed the parties that the Court would strike pleadings that violated Local Civil Rule 7(h), and that it would "assume[] facts identified by the moving party in its statement of facts are admitted, unless . . . controverted."  See [225] Order at 2 (Dec. 12, 2008).  Pursuant to this Order, the Court struck Plaintiffs' initial Opposition to Defendants' Motion for Summary Judgment because Plaintiffs' objections to Defendants' proffered facts were unsupported by citations to record evidence.  See Min. Order dated Feb. 19, 2009.  Plaintiffs re-filed their Opposition on February 23, 2009, admitting many of Defendants' proffered facts but continuing to object to certain of the them without record support.  These "disputed" facts shall be deemed conceded in accordance with the Court's prior Orders.  Accordingly, the Court shall cite directly to Defendants' Statement of Material Facts ("Defs.' Stmt.") and, where an objection has been made that includes record support, the Court shall cite to Plaintiffs' Response to Defendants' Statement of Material Facts ("Pls.' Resp. Stmt.").  The Court shall also cite directly to evidence in the record, where appropriate.  Finally, the Court notes that Plaintiffs submitted a Statement of Genuine Disputed Issues along with their Opposition.  Because this statement is unsupported by evidence in the record, the Court shall disregard it pursuant to Local Civil Rule 7(h)(1) and the Court's Orders relating to the same.

and appraisal of Plaintiffs' farm operation. *Id.* ¶ 15.  Mr. Kalina observed several pieces of

equipment on Plaintiffs' property that were not included in the Plan, including a "4650" tractor.

*Id.* ¶ 15.  Plaintiffs informed Mr. Kalina that this equipment, including the 4650 tractor, belonged

to his neighbors.  *Id.*  Based on the Plan that Mr. Kalina and Plaintiffs created (and Plaintiffs'

representations that the equipment visually observed by Mr. Kalina was not owned by them), the

FSA initially approved two loans for Plaintiffs – a refinance loan of $23,500 for tractor repairs on

a "4640" tractor, and an operating loan of $55,800.  *Id.* ¶ 14.  Problems arose almost

immediately.

On April 15, 2003, Mr. Kalina spoke with Plaintiffs about obtaining the financing

statement for their 4640 tractor.  *Id.* ¶ 17.  For the first time, Plaintiffs informed Mr. Kalina that

the requested financing actually related to a 4650 tractor that they had recently purchased, which

the Key Brothers Equipment store ("Key Brothers") could verify.  *Id.* ¶ 17.  When Mr. Kalina

spoke with Key Brothers, he discovered that Plaintiffs owed $23,268 for repairs associated with

the 4640 tractor, $24,000 associated with the 4650 tractor (including an outstanding payment of

$5,610), and $22,275 for various other parts and repairs.  *Id.* ¶¶ 19, 24.  Key Brothers informed

Mr. Kalina that approximately $38,280 was needed to bring Plaintiffs' account current.  *Id.* ¶ 19.

When Mr. Kalina asked Plaintiffs about the 4650 tractor, Plaintiffs explained that the 4650

tractor that Mr. Kalina previously observed, was an identical model owned by his neighbor, and

that his 4650 tractor was located in a friend's barn at the time.  *Id.* ¶ 20.  Although the 4640

tractor had been contemplated by the Plan, the 4650 tractor and the additional debt for parts and

repairs had not been disclosed by Plaintiffs and had not been known to the FSA when it initially

approved Plaintiffs' loans.  *Id.*  ¶¶ 22-27.

4

Mr. Kalina successfully sought to set up a payment plan with Key Brothers to lower

Plaintiffs' monthly payments and potentially allow a feasible Plan to be created. *Id.* ¶¶ 24-25, 28,

30.  Despite these efforts, the 4650 tractor added $5,610 to Plaintiffs' debt, and the payment plan

with Key Brothers added another $500 per month. *Id.* ¶ 31.  These additional debts prevented the

Plan from achieving cash flow by approximately $11,500. *Id.* ¶ 32.  On April 22, 2003, Mr.

Kalina met with Plaintiffs to discuss the Plan, and although they discussed ways in which

Plaintiffs could increase their cash flow or reduce their operating expenses, none of their ideas

resulted in the creation of a cash flow plan. *Id.* ¶¶ 33-35, 38.

On April 30, 2003, Larry Owens, the FSA's Texas Farm Loan Chief, rescinded the initial

approval of Plaintiffs' loans. *Id.* ¶ 39.  In a May 1, 2003 letter to Plaintiffs, Mr. Owens explained

that the FSA had decided to deny Plaintiffs' loan application for two reasons. *Id.* ¶ 40.  First, the

FSA concluded that Plaintiffs were not "creditworthy" based on their failure to disclose debts in

connection with the creation of their Plan:

> As you know, a lien search revealed a previously undisclosed debt of $24,078.00
> to John Deere Credit Corporation for a 4650 John Deere tractor.  While verifying
> that debt, FSA discovered an additional $22,000 dollar debt owed to Key Brothers
> Equipment for farm equipment parts and repairs.  Based upon this information,
> FSA has concluded that you are not eligible for loan assistance because you are
> not creditworthy as required by 7 C.F.R. 1910.5, FmHA Instructions 1910-A,
> section 1910.5(c), [which] states in part that: 'Applicants . . . will be determined
> not creditworthy if they have ever deliberately provided false information, [or]
> intentionally omitted information relative to the loan decision.'

Defs.' Mot., Ex. 28 at 1 (5/1/08 Letter from L. Owens to Plaintiffs).  Second, the FSA

determined that Plaintiffs' additional debts prevented the Plan from remaining feasible:

> Inclusion of the additional debt that was discovered during the pre-closing activity
> results in your plan of operation (cash flow projection) not being feasible . . . The
> inclusion of the additional debts discovered by the agency in your Farm & Home

Plan results in balance available in your plan lacking $11,458.00 to project a feasible plan.

*Id.* at 1-2.[3]

Dissatisfied with the FSA's handling of their loan application, Plaintiffs filed a complaint of discrimination through their attorney, Mr. James W. Myart.  *Id.*, Ex. 42 (10/27/03 Letter from C. Pearson to Plaintiffs).  The Office of Civil Rights for the Department of Agriculture investigated Plaintiffs' complaint and found no discrimination.  *Id.*  Plaintiffs initiated this lawsuit on November 3, 2003.

C.    *Procedural Background*

To suggest that this case has a tortured history is to dramatically understate the difficulties encountered during its prosecution (or lack thereof) by Plaintiffs.  The Court shall not again recount these difficulties, as they have been exhaustively described by Magistrate Judge John M. Facciola and the undersigned Judge in previous Orders and Opinions.  *See, e.g.*, [141] Mem. Op. & App'x (July 26, 2007) (describing the history of discovery abuses by Plaintiffs' counsel, including his failure to follow court orders, file required pleadings, cooperate with opposing counsel, and respond to or pursue appropriate discovery); [174] Am. Mem. Op. (Oct. 30, 2007) (describing a misrepresentation made by Plaintiffs' counsel to the Court and the baseless reasons that he proffered for the numerous extensions of time that delayed resolution of this case).  The Court shall incorporate these opinions by reference herein.  For present purposes, the Court shall

---

[3] Mr. Owens noted that Plaintiffs had suggested that they were going to begin a catering business to increase their planned income, but that Plaintiffs had not submitted a business plan or market analysis that supported their income projections, or submitted proof that they had obtained the health department permits necessary to operate such a business.  *See* Defs.' Mot., Ex. 28 at 2 (5/1/08 Letter from L. Owens to Plaintiffs).

simply note three relevant points about the procedural history of this case.

First, the parties were afforded the opportunity to pursue discovery in this case from July 2005 through June 2007.  Plaintiffs' efforts to take their own discovery were minimal:

> Discovery began in July of 2005.  From that date to at least March of 2007, Plaintiffs engaged in no discovery whatsoever.  More specifically, they did not give notice of their intention to take any depositions until those they noticed in the week before discovery is to end.  The persons to now be deposed include: the President of the United States, the Deputy Secretary of the United States Department of Agriculture, the Chief of Staff of the United States Department of Agriculture, and the Director of the Office of Civil Rights.  Plaintiffs contend that during their depositions they recounted a meeting with the President and then with other persons to be deposed and that these meetings provided evidence of persons with direct and relevant knowledge regarding matters before the Court.

> But, Plaintiffs have been aware of the meetings to which they refer since they occurred and cannot possibly say to have recently discovered their existence and significance . . . Even with the multiple stays granted in this case, Plaintiffs' waiting so late in the process to begin depositions hardly justifies the extension they seek.

[125] Order at 1-2 (Jun. 11, 2007) (internal punctuation omitted).  Plaintiffs' lack of initiative toward discovery was also reflected in their deficient responses to Defendants' discovery, for which Plaintiffs were sanctioned:

> Plaintiffs failed to adequately respond to Defendants' interrogatory regarding potential lay and expert witnesses – and at least twice the failure was in direct violation of court orders.  On April 27, 2006, when discovery responses were already two months overdue, the Court ordered Plaintiffs to supplement their response of 'will supplement' to the interrogatory on witnesses within ten days.  They did not do so.  Instead, Plaintiffs provided Defendants with the precise response the Court held insufficient in its previous order.  Despite this violation, the Court provided another opportunity for Plaintiffs to 'provide a list of all potential lay and expert witnesses known at this point in the case within ten days of this memorandum opinion or forego the introduction of witnesses at trial.'  Plaintiffs again failed to do so.  The result, as clearly stated in the Court's order, is the foregoing of the introduction of witnesses at trial.

[141] Mem. Op. at 6 (Jul. 26, 2007) (emphasis and internal citations omitted).  *See also* [92]

7

Mem. Op. at 16 ("[a]s a result of plaintiffs' violation of this Court's Order relating to [discovery], plaintiffs will only be allowed to introduce the two names provided as the only two similarly situated white farmers whose application[s] for [] farm operating loan[s] [were] treated more favorably than plaintiffs' application").

Second, the Court sought to ensure that Plaintiffs were apprised of the developments in their case by sending its Orders and Opinions directly to Plaintiffs themselves. *See, e.g.*, *id.* at 8 ("The Court . . . orders the Clerk to issue a copy of this Memorandum Opinion with the accompanying Order directly to Plaintiffs Mr. and Mrs. Williams"); [172] Order at 2 (Oct. 30, 2007) ("[the] Clerk shall issue a copy of this Order and accompanying Memorandum Opinion directly to Plaintiffs Mr. and Mrs. Williams").  Despite receiving the orders and opinions describing their counsel's conduct, Plaintiffs affirmatively decided to continue with Mr. Myart as their counsel.  *See* [183] Mot. to Amend, Ex. 11 at 11 (Nov. 28, 2007) (Affidavit of L. Williams) ("we want Mr. Myart to continue to be our lawyer").

Third, Mr. Myart's application to renew his membership in the bar of this Court was rejected in December 2007.  *See* [196] Order at 1 (Jan. 2, 2008).  The Court notified Plaintiffs by Order dated January 2, 2008, that their counsel could no longer file pleadings in this case, and thereafter allowed Plaintiffs an extensive period of time to either proceed *pro se* or to retain new counsel prior to moving forward with dispositive motions.  Ultimately, Plaintiffs retained new counsel in December 2008 – after Defendants had filed their Motion for Summary Judgment but prior to the deadline for Plaintiffs' Response.  *See* [225] Order at 1 (Dec. 12, 2008).  At the request of Plaintiffs' new counsel, the Court granted yet another extension of more than two months to allow counsel to prepare an appropriate response to Defendants' Motion for Summary

Judgment.  Plaintiffs filed an Opposition to Defendants' Motion for Summary Judgment on February 23, 2009, and Defendants filed a Reply on March 18, 2009.  This case is now ripe for resolution.

## II.  LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56, a party is entitled to summary judgment if the pleadings, the discovery and disclosure materials on file, and any affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).  Under the summary judgment standard, the moving party bears the "initial responsibility of informing the district court of the basis for [its] motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The non-moving party, in response to the motion, must "go beyond the pleadings and by [his] own affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party.  *Laningham v. U.S. Navy*, 813 F.2d

1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251 (the court must determine

"whether the evidence presents a sufficient disagreement to require submission to a [fact-finder]

or whether it is so one-sided that one party must prevail as a matter of law").  "If the evidence is

merely colorable, or is not sufficiently probative, summary judgment may be granted." *Liberty

Lobby*, 477 U.S. at 249-50 (internal citations omitted).  "Mere allegations or denials in the

adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary

judgment." *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996).  The adverse party must

do more than simply "show that there is some metaphysical doubt as to the material facts."

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Instead, while the

movant bears the initial responsibility of identifying those portions of the record that demonstrate

the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come

forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587 (citing

Fed. R. Civ. P. 56(e)) (emphasis in original).

### III.  DISCUSSION

Plaintiff's sole remaining claim in this case is brought under the Equal Credit

Opportunity Act ("ECOA"), which prohibits a creditor from discriminating against any applicant

on the basis of race, color, religion, national origin, sex, marital status, or age.  15 U.S.C. §

1691(a)(1).[4]  As an initial matter, the parties dispute the appropriate legal framework for

examining an ECOA discrimination claim.

Most courts have examined ECOA claims using the Title VII burden-shifting paradigm

---

[4] The Court dismissed Plaintiffs' other claims on July 5, 2005.  *See* [29] Mem. Op. at
1-16 (Jul. 5, 2005) (granting Defendants' Motion to Dismiss as to all claims except the pending
ECOA claim of discrimination).

articulated in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973).  *See, e.g.*, *Rosa v. Park W. Bank & Trust Co.*, 214 F.3d 213, 215 (1st Cir. 2000) ("[i]n interpreting the ECOA, this court looks to Title VII case law"); *Matthiesen v. Banc One Mortgage Corp.*, 173 F.3d 1242, 1246 (10th Cir. 1999) (affirming lower court's decision to analyze ECOA claim "in the same manner as discrimination claims brought under Title VII"); *Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 406 (6th Cir. 1998) (applying Title VII framework to ECOA claim).  Although the D.C. Circuit has not expressly adopted the *McDonnell Douglas* framework for ECOA claims, it has affirmed the decision of at least one district court that has applied it.  *See Mavity v. Veneman*, 2004 U.S. App. LEXIS 28796 at *4-*5 (D.C. Cir. Mar. 31, 2004) (rejecting the argument that "the [lower] court improperly used [a] direct evidence standard . . . rather than the burden-shifting framework of *McDonnell-Douglas*" in the context of an ECOA claim because the lower court considered the evidence "under the framework of *McDonnell-Douglas* and its progeny").

Acknowledging the weight of the foregoing authority, Defendants analyze Plaintiffs' ECOA claim under the *McDonnell Douglas* framework.  *See* Defs.' Mot. at 13-21.  In contrast, Plaintiffs argue that *McDonnell Douglas* does not supply the appropriate legal standard, citing *Latimore v. Citibank Federal Savings Bank*, 151 F.3d 712 (7th Cir. 1998).  *See* Pls.' Opp'n at 12. In *Latimore*, the Seventh Circuit held that the *McDonnell Douglas* framework was unsuitable for ECOA claims "when there is no basis for comparing the defendant's treatment of the plaintiff with the defendant's treatment of other, similarly situated persons."  151 F.3d at 714.  Instead, the court held that a plaintiff could "show in a conventional way, without relying on any special doctrines of burden-shifting, that there is enough evidence, direct or circumstantial, of discrimination to create a triable issue."  *Id.* at 715.  Although Plaintiffs do not advocate the

adoption of a particular standard (beyond arguing that the standard should not be based on the *McDonnell Douglas* framework), any distinction drawn between *Latimore* and the cases applying the *McDonnell Douglas* framework is more illusory than real.

The D.C. Circuit has explained that the burden-shifting framework of *McDonnell Douglas* is "almost always irrelevant." *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 492-93 (D.C. Cir. 2008). Where an employer asserts a legitimate, non-discriminatory reason for its challenged conduct, thereby doing "everything that would be required of [it] if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant." *Id.* (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983)). Where a defendant asserts a legitimate, non-discriminatory reason, a district court's inquiry collapses into a single question: "[h]as the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *Id.* at 494. In other words, the district court's inquiry in such cases is functionally identical to the one contemplated by the Seventh Circuit in *Latimore* – *i.e.*, whether the plaintiff has produced evidence of discrimination sufficient to create a genuine issue of material fact.

In this case, Defendants have asserted two legitimate, non-discriminatory reasons for the denial of Plaintiffs' loan application – (1) that Plaintiffs were not "creditworthy" based on their failure to disclose debts in connection with the creation of the Plan, and (2) that Plaintiffs' additional debts prevented the Plan from remaining feasible. Accordingly, the Court's inquiry in this case is the same regardless of whether it applies the *McDonnell Douglas* framework or the

standard articulated in *Latimore* – whether Plaintiffs have proffered evidence that their loan

application was denied based on their race rather than the two reasons advanced by Defendants.

Plaintiffs present three arguments in their Opposition in connection with this inquiry.

First, Plaintiffs argue that "creditworthy" is not a criteria for loan eligibility, and that without

such a requirement, Plaintiffs "were eligible for financial assistance from FSA." Pls.' Opp'n at

14. Second, and in the alternative, Plaintiffs argue that even if "creditworthy" is an element of

eligibility, that "Defendants fail to provide sufficient evidence . . . to support their claim that

Plaintiffs deliberately and intentionally did not add the loan for the . . . 4650 tractor." *Id.* at 15.

Third, Plaintiffs argue that they should be granted additional discovery under Federal Rule of

Civil Procedure 56(f) in the hopes that they would discover evidence of discrimination and

successfully oppose Defendants' Motion for Summary Judgment. *Id.* at 16-18. The Court shall

address each of these arguments in turn.

Plaintiffs' first argument is both legally erroneous and factually irrelevant. Legally, the

Court agrees with Defendants that "[i]t is hard to see how an inquiry into a loan applicant's

'credit history' . . . could prevent USDA from determining that a particular loan applicant is not

'creditworthy.'" Defs.' Reply at 8. As described above, the USDA Instruction concerning the

evaluation of loan applications specifically contemplates such an inquiry. Defs.' Reply, Ex. A at

2 (Instruction 1910-A(c)) ("[a]pplicants . . . will be determined not creditworthy if they have ever

deliberately provided false information, intentionally omitted information relative to the loan

decision, or have not made every reasonable effort to meet the terms and conditions of any

previous loan"). Plaintiffs do not argue that this Instruction exceeds the scope of the USDA's

statutory authority, *see* Pls.' Opp'n at 15, and such instructions are entitled to deference. *See*

*Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (holding that courts "must give substantial deference to an agency's interpretation of its own regulations"). Plaintiffs also authorized an inquiry into their creditworthiness as a part of their loan application, certifying that their representations were "complete and correct" and "authoriz[ing] the FSA to make all inquiries deemed necessary to verify the accuracy of the information contained [therein] to determine [Plaintiffs'] credit-worthiness and to answer questions about their credit experience with [Plaintiffs]." Defs.' Mot., Ex. 6 at 3 (10/29/08 Facsimile Copy of the Plan).[5]

Factually, Plaintiffs' argument fails for several reasons, not the least of which is that, even assuming Plaintiffs were able to show that Defendants mistakenly applied the eligibility criteria, Plaintiffs would still have to proffer evidence that Defendants applied the criteria incorrectly *based on* Plaintiffs' race, which they have not done. *See, e.g.*, *Brady*, 520 F.3d at 493, 496 n.4 ("[e]ven if [the plaintiff] showed that the sexual harassment incident was not the actual reason for his demotion, he still would have to demonstrate that the actual reason was a racially discriminatory reason") (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 402, 514 (1993)). Plaintiffs have not presented the Court with *any* evidence from which racial discrimination could reasonably be inferred.

Additionally, and no less significantly, Defendants rejected Plaintiffs' loan application based on their ineligibility *and* on the basis that the Plan was not feasible. *See* Defs.' Mot., Ex.

---

[5] The Court notes that a *different* regulation concerning loan approvals, 7 C.F.R. § 1941.33, was amended in 2003, and the word "creditworthy," which had appeared in the pre-amendment text, was eliminated in the post-amendment text. It does not follow, however, that an inquiry into an applicant's credit history under 7 C.F.R. § 1910.5 cannot consider whether an applicant has provided false information in connection with his or her loan application. In fact, the D.C. Circuit has since noted that the USDA criteria concerning eligibility decisions "emphasizes credit history and reliability." *Love v. Johanns*, 439 F.3d 723, 725 (D.C. Cir. 2006).

28 (5/1/08 Letter from L. Owens to Plaintiffs).  Plaintiffs do not dispute that Defendants could

only approve a plan that was feasible.  *See* 7 C.F.R. § 1931.33(b) (allowing approval of loan

applications only when they comply with all established policies and regulations, including the

requirement that "[t]he proposed loan is based on a feasible plan").  Thus, regardless of whether

or not Plaintiffs were creditworthy, it remains undisputed that Defendants denied Plaintiffs' loan

application for a legitimate, non-discriminatory reason.

Plaintiffs' second argument fares no better.  Acknowledging that an inquiry into whether

Plaintiffs intentionally omitted items from their Plan could be relevant to the approval or denial

of their loan application, Plaintiffs argue that "Defendants fail to provide sufficient evidence . . .

to support their claim that Plaintiffs deliberately and intentionally did not add the loan for the

. . . 4650 tractor."  *Id.* at 15.  This argument suffers from several deficiencies.  First, as support

for this argument, Plaintiffs rely on an unsworn one-paragraph letter signed by Mr. Williams.

*See, e.g.*, Pls.' Resp. Stmt. ¶¶ 29, 37.  This letter states that Mr. Williams did not intentionally

omit the 4650 tractor from the Plan, but rather, that he "paid no attention to [the] tractor because

it did not belong to [him], [he] was merely leasing it, and that is why it wasn't included in the

plan."  Pls.' Opp'n, Ex. 1 at 1 (2/20/09 Letter from R. Williams to Whom It May Concern).

This explanation conflicts with the evidence in the record indicating that the tractor was

purchased, not leased.  *See, e.g.*, Pls.' Opp'n at 15-16 ("when Mr. Williams was questioned as to

why he did not report the loan on the John Deere 4650 tractor, he stated that 'he *purchased* the

tractor outside of the FSA and he did not think it should be shown on the balance sheet'")

(emphasis added).  And, as an unsworn statement, Mr. Williams' letter is not admissible to create

a genuine issue of material fact.  *See* Fed. R. Civ. P. 56(e)(2).

15

Second, even if the letter were admissible, it would not create a genuine issue of material fact because the FSA found that Plaintiffs failed to disclose *two* debts – the debts associated with the 4650 tractor and the debts associated with repairs and parts purchased from Key Brothers. *See* Defs.' Mot., Ex. 28 (5/1/08 Letter from L. Owens to Plaintiffs).  Mr. Williams' letter does not even address his omission of this second debt.  Third, Plaintiffs' argument does nothing to undermine the other legitimate, non-discriminatory reason for rejecting Plaintiffs' application – that Plaintiffs' Plan was not feasible.  There is nothing in the record demonstrating otherwise.[6]

Plaintiffs' third and final argument is that they should be allowed additional discovery under Federal Rule of Civil Procedure 56(f) in the hopes that they may locate evidence of discrimination that would allow them to oppose successfully Defendants' Motion for Summary Judgment.  *See* Pls.' Opp'n at 16-18.  This argument has no merit.  As an initial matter, this request is not accompanied by an affidavit demonstrating that Plaintiffs "cannot present facts essential to justify [] opposition," as is required by Rule 56(f).  *See* Fed. R. Civ. P. 56(f).  Equally problematic, the two issues identified by Plaintiffs as potential targets for additional discovery are nonsensical.  The first issue relates to whether one of the two potential comparators identified

---

[6] Plaintiffs are not helped by the record evidence concerning two potential white comparators identified in discovery.  The first potential comparator did not apply for a loan from the FSA in 2003.  The second potential comparator applied for loan subordination, which requires an already outstanding loan with the USDA.  Plaintiffs proffer no evidence that this farmer's credit situation and farm operation were similar to that of Plaintiffs by showing that he omitted debts from his loan application or proposed an operation that was not feasible.  *See, e.g.*, Defs.' Stmt. ¶ 48.  For these reasons, Plaintiffs' Opposition appears to concede that these individuals cannot be considered comparators.  *See* Pls.' Opp'n at 12 (arguing that the legal standards articulated in *Latimore* applied in this case because the *McDonnell Douglas* framework is inapplicable "'where there is no basis for comparing the defendant's treatment of the plaintiff with the defendant's treatment of other, similarly situated persons'") (quoting *Latimore*, 151 F.3d at 714)).

16

in discovery "is in fact a similarly situated comparator to Plaintiffs."  Pls.' Opp'n at 17.

Plaintiffs need no discovery to ascertain this information, as this individual[7] was deposed during

the discovery phase of this case, and he testified that he last applied for a loan from the FSA in

1992 (not 2003), that his application sought loan subordination (not a new operating loan), and

that Mr. Kalina had no involvement with his 1992 application.  *See* Defs.' Ex. 23 at 8:8 - 8:25.

In short, no additional discovery could convert this individual into a comparator.  The second

issue identified by Plaintiffs concerns whether Plaintiffs' potential income would have been

supplemented in 2003 by the commencement of a catering business.  Pls.' Opp'n at 17.  Here,

Plaintiffs clearly do not require a re-opening of discovery because, if they began to operate a

catering business in 2003, such records would already be in their possession.  In fact, Plaintiffs'

Opposition appears to concede that they did *not* operate a catering business in 2003.  *Id.*

(referring to the income that "may" have been earned, suggesting that such income was not

actually earned).

Even if Plaintiffs had submitted an appropriate affidavit and identified appropriate areas

for additional discovery, the purposes supporting application of Rule 56(f) clearly do not exist in

this case.  "'[T]he purpose of Rule 56(f) is to prevent railroading the non-moving party through a

premature motion for summary judgment before the non-moving party has had the opportunity to

make full discovery.'" *Kakeh v. United Planning Org.*, 537 F. Supp. 2d 65, 71 (D.D.C. 2008)

(quoting *Bancoult v. McNamara*, 217 F.R.D. 280, 282 (D.D.C. 2003)).  There is nothing

premature about Defendants' Motion for Summary Judgment.  As discussed above, Plaintiffs

---

[7] The Court shall refrain from using this individual's name based on the Protective Order
approved by the Court on December 4, 2007.

were given a full opportunity to engage in discovery from July 2005 through June 2007.  That Plaintiffs failed to take the discovery they now deem necessary does not make Defendants' motion premature.  Similarly, the fact that Plaintiffs were represented by counsel whose conduct resulted in discovery sanctions (as to which they were fully informed), or that Plaintiffs have now switched counsel, provides no basis to reopen discovery.  If that were not the case, every plaintiff who is subject to sanctions based on discovery abuses or whose counsel failed to pursue appropriate discovery would simply switch counsel and seek to reopen discovery pursuant to Rule 56(f).  In short, the position in which Plaintiffs now find themselves is a product of their own choices and those of their counsel.

Because Defendants' reasons for denying Plaintiffs' loan application are supported by undisputed evidence in the record, and because Plaintiffs proffer no evidence from which to find that Defendants denied their loan application based on racial discrimination, the Court finds that entry of summary judgment in favor of Defendants is appropriate.

## IV.  CONCLUSION

For the reasons set forth above, the Court shall GRANT Defendants' [223] Motion for Summary Judgment.  This case shall be DISMISSED in its entirety.  An appropriate Order accompanies this Memorandum Opinion.

Date: June 1, 2009

_____/s/_____

**COLLEEN KOLLAR-KOTELLY**
United States District Judge